AO 106 (Rev. 04/10) Application for a Search Warrant

FILED
US DISTRICT COURT
WESTERN DISTRICT
OF ARKANSAS
Feb 21, 2024
OFFICE OF THE CLERK

# UNITED STATES DISTRICT COURT
### for the
### Western District of Arkansas
### Texarkana Division

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF CERTAIN INFORMATION, INCLUDING CONTENTS OF COMMUNICATIONS, ASSOCIATED WITH THE GOOGLE ACCOUNT 'dougjmohler@gmail.com' WHICH IS STORED AT PREMISES CONTROLLED BY GOOGLE, LLC, AND/OR ITS PARENT COMPANY, ALPHABET, INC. | No. ___4:24-cm-02___<br><br>**Filed Under Seal** |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe property to be searched and give its location):*
**See "Attachment A"**

located in the Northern District of California there is now concealed *(identify the person or describe the property to be seized)*:
**See "Attachment B." This Court has authority to issue the requested search warrant under 18 U.S.C. §§ 2703(c)(1)(A) and 2711(3)(A), and Federal Rule of Criminal Procedure 41.**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
[ x ] evidence of a crime;
[ x ] contraband, fruits of crime, or other items illegally possessed;
[ x ] property designed for use, intended for use, or used in committing a crime;
[   ] a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation, in the Western District of Arkansas, of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1343 | Wire Fraud |

The application is based on these facts:  (See attached affidavit of FBI Special Agent Cody Graham)

[ x ]   Continued on the attached sheet.

[   ]   Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

(Appearing by telephone conference call at 415-527-5035)
Special Agent Cody Graham, Federal Bureau of Investigation
*Affiant*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1, by appearing via telephone conference call at 415-527-5035.

Date: __February 21, 2024__

City and state: __Texarkana__

_____
*Judge's signature*

Hon. Barry A. Bryant, United States Magistrate Judge, W. D. Ark.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF CERTAIN INFORMATION, INCLUDING CONTENTS OF COMMUNICATIONS, ASSOCIATED WITH THE GOOGLE ACCOUNT 'dougjmohler@gmail.com' WHICH IS STORED AT PREMISES CONTROLLED BY GOOGLE, LLC, AND/OR ITS PARENT COMPANY, ALPHABET, INC. | Case No. ___4:24-cm-02___ <br> **Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Cody Graham, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a warrant to seize and search certain information, including contents of communications, associated with the Google account identified by the unique Google email address '*dougjmohler@gmail.com*' and further described in Attachment A hereto (hereinafter the "**Target Google Account**") which is stored at premises owned, maintained, controlled, or operated by Google, LLC, and/or its parent company, Alphabet, Inc., (hereinafter collectively "Google"), an electronic communications service and/or remote computing service provider headquartered at 1600 Amphitheater Parkway, Mountain View, California, in the Northern District of California.  The information to be searched is described in the following paragraphs, and in Attachment A hereto.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2.     I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been so employed since August 2020. Since January 2021, I have been assigned to the FBI's Texarkana Resident Agency, where I am responsible for investigating violations of federal law, to include complex financial crimes. As an FBI Special Agent, I have received training and garnered hands-on experience in the detection and investigation of such crimes, as well as on the expanding use of internet-based communications facilities in their commission. Through my training and experience, I have become familiar with the methods and techniques used by criminals to commit financial crimes, such as wire fraud, and how those criminals conceal and store information and assets related to and derived from such criminal activity.

3.     The facts in this affidavit come from my personal observations and investigation, from my training and experience, and from information obtained from witnesses and other FBI special agents. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant, and therefore does not set forth all of my knowledge about this matter.

4.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Section 1343 (wire fraud) have been committed by DOUGLAS J. MOHLER in the Western District of Arkansas, and elsewhere. There is also probable cause to search the **Target Google Account**, described in Attachment A, for evidence, fruits and/or instrumentalities of those crimes, as further described in Attachment B.

## JURISDICTION

5.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), &

2

(c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated," as set forth in 18 U.S.C. § 2711(3)(A)(i).

## IDENTIFICATION OF INVOLVED PERSONS AND ENTITIES

6.   During the time periods described in this affidavit:

a.  Douglas J. MOHLER (hereinafter "MOHLER") owned and controlled multiple business entities, three of which—R8 Coatings, LLC, R8 Ghana Ltd., and R&D International Holdings, LLC—were headquartered and/or operated in the Western District of Arkansas;

b.  R8 Coatings, LLC, (hereinafter "R8 Coatings") was a Limited Liability Company organized by MOHLER in 2019, under the laws of the State of Minnesota.  Following its organization, R8 Coatings was principally owned, and was controlled, by MOHLER.  R8 Coatings operated a business location at a rented/leased facility located at 121 Airport Road, in Hope, Hempstead County, Arkansas, in the Western District of Arkansas.   R8 Coatings represented that it sold and installed roof coating products designed to increase the solar reflectivity, and thus cool the interiors, of commercial buildings, including agricultural structures, such as poultry houses;

c.  R8 Ghana Ltd. (hereinafter "R8 Ghana"), was a business entity organized by MOHLER in 2019, purportedly under the laws of the nation of Ghana.  R8 Coatings held a majority interest in R8 Ghana, with the remaining interest said to be held by a number of private Ghanaian investors.  MOHLER controlled and operated R8 Ghana, purportedly from the same location as R8 Coatings, on

3

Airport Road, in Hope, Arkansas.  Among other things, R8 Ghana represented that it had the exclusive right to market R8 Coatings products in Africa.

d.  R&D International Holdings, LLC, (hereinafter "R&D International") was a Limited Liability Company organized by MOHLER in 2019, under the laws of the State of Delaware.  Following its organization, R&D International was owned and controlled by MOHLER, and purported to operate from the same location as R8 Coatings and R8 Ghana, on Airport Road, in Hope, Arkansas. R&D International represented that it directed the operations of R8 Ghana's poultry-related projects in Africa.

e.  Michael YATES (hereinafter "YATES") was an employee of R8 Coatings. YATES went to work for MOHLER and R8 Coatings in 2019, having previously worked in the Arkansas poultry and farm loan industries.  YATES' primary role with R8 Coatings was to obtain roof coating jobs using his existing industry contacts;

f.  Robert LONG (hereinafter "LONG") was a business partner in, and/or an employee of, R8 Coatings.  After closing an existing business, LONG installed roof coatings for R8 Coatings beginning in or about 2019.  LONG also later set up and operated certain cloud-based business software for R8 Coatings, in a business-planning role.

## PROBABLE CAUSE

### The Fraud Scheme and Use of the Target Google Account Generally

7.      FBI's Texarkana Resident Agency is investigating allegations of fraud committed by MOHLER in connection with R8 Coatings.  The investigation concerns possible violations of,

*inter alia*, Title 18, United States Code, Section 1343 (wire fraud). During the period of the reported wire fraud, FBI has learned that MOHLER was residing in the Hope, Arkansas, area, and that R8 Coatings was primarily doing business in southwest Arkansas, in the Western District of Arkansas, including contracting to apply commercial roof coatings on poultry houses.

8.      Since the investigation began, FBI has identified thirteen (13) individuals who report investing money in, and/or loaning money to, R8 Coatings and/or MOHLER, at the behest of MOHLER (hereinafter collectively the "Victims"). Eight (8) of the Victims resided in the Western District of Arkansas at the time of their investments/loans. Collectively, the Victims report that, between early to mid-2018 and mid-2021 (hereinafter the "Fraud Scheme Period"), MOHLER convinced them to invest funds in, or loan money to, R8 Coatings, in exchange for an ownership stake in R8 Coatings, a share of its profits, and/or significant returns/interest. In each case, the Victims report that MOHLER told them their investment or loan would be used toward the business endeavors of R8 Coatings and/or related entities R8 Ghana and R&D International, such as for the marketing of a supposed new commercial roof coating product. In several cases, the Victims report that MOHLER showcased that roof coating product for them, as potential investors and/or lenders.

9.      Certain R8 Coatings business records obtained from one of the Victims (hereinafter individually "Victim 2") reveal that between at least May 2020 and December 2020, the email address associated with the **Target Google Account** was being provided as the business e-mail address for R8 Coatings. These business records consisted of shareholder agreements, employment contracts, and letter of payments received.

10.     In the course of its investigation, the FBI has interviewed a cooperating witness (CW) with knowledge of MOHLER's business practices. The CW reported that they had picked

5

up investment checks for MOHLER on a number of occasions, and had delivered them to either MOHLER or LONG. In so doing, the CW learned that MOHLER kept an account First National Bank of Tom Bean (hereinafter "FNBTB") for R8 Coatings' business, and also kept an account at BancorpSouth for his personal use (hereinafter collectively the "Bank Accounts"). The CW also advised that MOHLER used the **Target Google Account** to solicit investments in R8 Coatings, including by emailing brochures and proposed business agreements. According to the CW, MOHLER claimed that he obtained his roof coating product through a paint manufacturer in Minnesota. As MOHLER's businesses began faltering, the CW reported, MOHLER began telling his investors that the paint manufacturer could not obtain titanium, which he said was a necessary component of the roof coating product. The CW said that MOHLER eventually left Arkansas for Minnesota, telling YATES that he was working to get paint mixers and labs for R8 Coatings' facility in Hope, Arkansas. Later, the CW advised, the Hempstead County, Arkansas, Sheriff's Office served an eviction notice at that Hope facility, in late 2021.

11.     Documents provided by the Victims, and obtained via legal process (including records of the Bank Accounts) show that between August 10, 2018 and May 6, 2021, the Victims provided MOHLER an aggregate total of $613,512.76 (hereinafter the "Funds"). All of the Funds were deposited and/or transferred into one or both of the Bank Accounts. Records of those accounts show that the Victims provided the Funds to MOHLER via personal checks, wire transfers, and/or cash payments. However, since MOHLER received the Funds, the Victims jointly report that he has either ceased all communication with them, and/or that he has failed to provide any substantive information regarding the status of their loans and investments, or the returns and interest they were promised. The Victims collectively report that they have received

6

nothing that MOHLER promised them in exchange for their investments or loans, and that MOHLER has never refunded their money.

### Communication with Victim 1 via the Target Google Account

12.    In response to legal process, FNBTB has provided records showing that, in August 2019, one of the Victims (hereinafter individually "Victim 1") sent MOHLER $300,000.00, via a wire transfer to R8 Coatings' FNBTB business account. FNBTB records reflect that MOHLER and LONG were signatories on that account, at the time of this wire transfer. Prior to Victim 1's $300,000.00 wire transfer, the R8 Coatings account had a balance of only $212.56. The wire's purpose was noted as business. Victim 1 advises FBI that he wired the $300,000.00 to MOHLER based upon MOHLER's representation that it would be used to finance and fulfill a large roof coating sales order recently received by R8 Coatings. According to Victim 1, MOHLER had represented that this single sales order—which MOHLER said was placed by a Minnesota poultry operation seeking to have thirty-three (33) turkey barn roofs coated—would generate $900,000.00 in profit for R8 Coatings, which consequently had solid financial projections. In return for Victim 1's $300,000.00 investment, MOHLER told Victim 1 that he would receive a 20% stake in R8 Coatings' future earnings, up to a maximum total return of $600,000.00. However, after Victim 1 wired the $300,000.00 in investment funds to MOHLER, Victim 1 says MOHLER ceased all communication with him. More than four years later, Victim 1 advises that he has received no updates whatsoever, regarding the progress of the supposed R8 Coatings sales order, nor has MOHLER returned his money.

13.    Email records provided to the FBI by Victim 1 show that the email address associated with the **Target Google Account** was used to communicate with Victim 1 regarding R8 Coatings, during the Fraud Scheme Period—both before and after Victim 1's $300,000

7

investment in that company. The first email (hereinafter "Email 1") appears to have originally been addressed to MOHLER by an Arkansas poultry company. On July 23, 2018, it was sent from the **Target Google Account** to email addresses belonging to Victim 1 and R8 Coatings employee Michael YATES. Email 1 reads as follows:

> Doug, the [company name redacted] Hope Complex Live Production Team has started recommending the Infinity Coat - Shade -to our poultry producers to reduce internal building temperatures, reduce bird stress and increase bird weight. The coating applied to the roofs our poultry houses will reduce building surface temperature and eliminate rust. We will discuss and talk about the product in future grower meetings. Thanks.

14.     The second email provided by Victim 1 (hereinafter "Email 2") appears to have been sent on September 25, 2019, from the **Target Google Account** to Victim 1's email address. Email 2 contains photos appearing to depict laboratory testing of R8 Coatings' products by the Ghanaian government. Emails 1 and 2 substantiate that MOHLER utilized the **Target Google Account** to communicate with a potential, and later current, investor regarding R8 Coatings' business during the Fraud Scheme Period.

### Communication with Victim 3 via the Target Google Account

15.     On November 22, 2022, I interviewed another of the Victims (hereinafter "Victim 3"), regarding his investment in MOHLER's separate entity, R&D International. Victim 3 stated that, on May 19, 2020, he invested $10,000.00 into R&D International, via two separate credit card payments of $5,000.00 each. Victim 3 said that MOHLER told him his investment would be worth five shares of R&D International, and would be utilized to start up R8 Ghana. Victim 3 stated that LONG handled all of the documentation. Thereafter, Victim 3 said he became frustrated with MOHLER's failure to update him on the status of his investment. By December 2020, Victim 3 said his communication with MOHLER had ended. Victim 3 said he was still able to contact

8

LONG, who told him that MOHLER was working to return Victim 3's investment funds, but needed time. By October 2022, Victim 3 said he had stopped communicating with LONG, who he said had simply continued to make excuses for why his investment funds had not been returned.

16.    Victim 3 provided the FBI a copy of a document purporting to be an R&D International shareholder agreement. Victim 3 said that MOHLER had sent this agreement to him in or around May 2020, from the email address associated with the **Target Google Account**. The agreement, which was signed by Victim 1 on May 18, 2020, states as follows:

> The fair market value of the shares will be set by the shareholders on an annual basis and will be communicated by way of a shareholders resolution declaring that the shareholders agree that the Fair Market Value of each share of each class and series is a specified amount. At the date of this agreement the Fair Market value of the shares is as follows: $25,000.

### Communication with Victim 4 via the Target Google Account

17.    On August 21, 2023, I interviewed another of the Victims (hereinafter "Victim 4") regarding his dealings with MOHLER. Victim 4 stated that he owns a Minnesota-based manufacturing firm, and had known MOHLER professionally since about 2010. Victim 4 said that MOHLER had introduced him to various of MOHLER's business ventures, including R8 Coatings. Victim 4 said that, in April 2020, Victim 4 funded the patent work and supplies to develop two prototypes for another of MOHLER's business entities. Victim 4 said this had cost him $102,000.00, but that MOHLER had promised him a 25% stake in that separate business entity, in return. Thereafter, Victim 4 said, MOHLER showcased one of the prototypes around Minnesota, in an attempt to obtain additional investors for that separate business entity. Victim 4 said that he did not hear from MOHLER after the prototypes were completed, and that he had attempted, but failed, to contact MOHLER for a patent release. Victim 4 has provided the FBI

purported investment documents for that separate MOHLER-controlled business entity.  Victim 4 states that MOHLER emailed him these documents in or around April, 2020, from the email address associated with the **Target Google Account.**

### Use of the Target Google Account for Communications Between Mohler and Long

18.     On May 18, 2022, former R8 Coatings employee Michael YATES was interviewed at the FBI's Texarkana Resident Agency.  YATES told agents that MOHLER asked him to work for him, and to help launch MOHLER's R8 Coatings business, because YATES had contacts in the chicken and farm loan industry.  YATES said MOHLER told him he wouldn't be paid first, but once R8 Coatings became financially stable, YATES would make $150K annually.  On March 4, 2019, YATES began working for R8 Coatings, and his primary role was working with chicken growers and builders to establish R8 Coating jobs.  YATES said MOHLER only shared financial documentation with his R8 Coatings business partner Robert LONG.  YATES said that whenever he picked up an investor's check, he would deliver the check to either LONG or MOHLER.  YATES said that MOHLER used First National Bank of Tom Bean for R8's business account, and BancorpSouth for MOHLER's own personal account.  YATES said that, during his employment with R8 Coatings, between March 2019 and late 2021, MOHLER used the email address associated with the **Target Google Account** to communicate with LONG about investment funds and business matters.

### Mohler's Relevant Financial and Business History

19.     On November 21, 2021, MOHLER's daughter, Kady MODISETTE, contacted your Affiant regarding her father.  MODISETTE told me that, in October 2021, MOHLER had been attempting to arrange travel to Africa when he contracted COVID-19.  Modisette said she had reached out to a family friend who was a nurse practitioner, for guidance on MOHLER's

condition. In the process, the friend informed Modisette that he had invested $2,500.00 in R8 Coatings, but had never received exact details of his investment. MODISETTE said the friend told her he knew of another person who had invested $100,000.00 in R8 Coatings. FNBTB records for the R8 Coatings business account show that the family friend's $2,500 investment was received and deposited into that account on or about June, 2019.

20.     MODISETTE recalled MOHLER beginning his coating business under the name "Innovative Coatings," but said that, after suffering setbacks over the years, MOHLER had rebranded the company as R8 Coatings. MODISETTE said that, while she was growing up, her family had frequently experienced financial difficulties, and MOHLER's constant motto was that he was "chasing the money." MODISETTE said she is a signatory on a Bancorp South account with MOHLER, and that would sometimes wire money to various individuals in Africa at MOHLER's request. MODISETTE also said that, in the past, she has also withdrawn money from the Bancorp South account in order to pay on a loan MOHLER had with FNBTB, but that she did not know what the loan was for.

### Continuing Use of the Target Google Account

21.     In or around February 2023, MOHLER—who had become aware of the FBI's investigation of his business activities—contacted the FBI's Texarkana Resident Agency by phone. During that call, MOHLER stated that he had a list of investors whose money he was working to refund. MOHLER also stated that his email address was still the email address associated with the **Target Google Account**. Thereafter, MOHLER did not respond for a follow-up interview requested by agents.

22.     Pursuant to a Section 2703(d) order issued by this Court in November 2023, Google has provided records showing that the user of the Target Google Account has accessed it

11

consistently and frequently between its creation on February 20, 2009, and November 15, 2023—a period of over fourteen (14) years. During the time period covered by the 2703(d) order, Google's records show that the **Target Google Account** was most recently accessed by the user in October 2023. Google's records further reflect that the user of the **Target Google Account** provided their name as "Doug Mohler", and gave a date of birth corresponding with MOHLER's, as reflected in public records accessible to the FBI. As of November 15, 2023, Google's records show that the **Target Google Account** remained active, or enabled. Given that the Target Google Account has been used frequently for nearly a decade and a half, and since it remained active as recently as three months ago (at least about eight months after MOHLER became aware of this investigation), I have probable cause to believe that the **Target Google Account** remains active, and in use by MOHLER, through the date of this affidavit.

23.     On March 17, 2022, the FBI sent a written request to Google, asking that it retain and preserve any and all information and materials associated with the **Target Google Account**, including contents of communications, from the date of the account's creation. Google acknowledged receipt of that preservation request, and informed FBI that the information and materials would be preserved. Since then, the FBI has sent Google multiple extensions of that initial preservation request, the most recent of which remains in effect through March 20, 2024. I therefore have probable cause to believe that information and materials which were stored in, and associated with, the **Target Google Account** as of March 17, 2022 (well before MOHLER is known to have become aware of this investigation), including contents of communications, presently remain in Google's possession or control. I also have probable cause to believe that such information and materials created *between* March 17, 2022 and the present, including contents of communications, likewise remain preserved in Google's possession.

## BACKGROUND CONCERNING GOOGLE[1]

24.     Google is a United States company that offers to the public through its Google Accounts a variety of online services, including email, cloud storage, digital payments, and productivity applications, which can be accessed through a web browser or mobile applications. Google also offers to anyone, whether or not they have a Google Account, a free web browser called Google Chrome, a free search engine called Google Search, a free video streaming site called YouTube, a free mapping service called Google Maps, and a free traffic tracking service called Waze. Many of these free services offer additional functionality if the user signs into their Google Account.

25.     In addition, Google offers an operating system ("OS") for mobile devices, including cellular phones, known as Android. Google also sells devices, including laptops, mobile phones, tablets, smart speakers, security cameras, and wireless routers. Users of Android and Google devices are prompted to connect their device to a Google Account when they first turn on the device, and a Google Account is required for certain functionalities on these devices.

26.     Signing up for a Google Account automatically generates an email address at the domain 'gmail.com.' That unique email address will act as the log-in username, for access to the user's Google Account.

27.     Google advertises its services as "One Account. All of Google working for you." Once logged into a Google Account, a user can connect to Google's full suite of services offered to the general public, described in further detail below. In addition, Google keeps certain records

---

[1]   The information in this section is based on information published by Google on its public websites, including, but not limited to, the following webpages:  the "Google legal policy and products" page available to registered law enforcement at lers.google.com; product pages on support.google.com; or product pages on about.google.com.

indicating ownership and usage of the Google Account across services, described further after the description of services below.

28. Google provides email services (called 'Gmail') to Google Accounts through email addresses at 'gmail.com' or enterprise email addresses hosted by Google. Gmail can be accessed through a web browser or a mobile application. Additional email addresses ("recovery," "secondary," "forwarding," or "alternate" email addresses) can be associated with the Google Account by the user. Google preserves emails associated with a Google Account indefinitely, unless the user takes affirmative steps to delete them.[2]

29. Google provides an address book for Google Accounts through Google Contacts. Google Contacts stores contacts the user affirmatively adds to the address book, as well as contacts the user has interacted with in Google products. Google Contacts can store up to 25,000 contacts. Users can send messages to more than one contact at a time by manually creating a group within Google Contacts or communicate with an email distribution list called a Google Group. Users have the option to sync their Android mobile phone or device address book with their account so it is stored in Google Contacts. Google preserves contacts indefinitely, unless the user takes affirmative steps to delete them. Contacts can be accessed from the same browser window as other Google products like Gmail and Calendar.[3]

30. Google provides an appointment book for Google Accounts through Google Calendar, which can be accessed through a browser or mobile application. Users can create events or RSVP to events created by others in Google Calendar. Google Calendar can be set to generate

---

[2] https://support.google.com/mail

[3] https://support.google.com/contacts

14

reminder emails or alarms about events or tasks, repeat events at specified intervals, track RSVPs, and auto-schedule appointments to complete periodic goals (like running three times a week). A single Google Account can set up multiple calendars. An entire calendar can be shared with other Google Accounts by the user or made public so anyone can access it. Users have the option to sync their mobile phone or device calendar so it is stored in Google Calendar. Google preserves appointments indefinitely, unless the user takes affirmative steps to delete them. Calendar can be accessed from the same browser window as other Google products like Gmail and Calendar.[4]

31.     Google Drive is a cloud storage service automatically created for each Google Account. Users can store an unlimited number of documents created by Google productivity applications like Google Docs (Google's word processor), Google Sheets (Google's spreadsheet program), Google Forms (Google's web form service), and Google Slides (Google's presentation program). Users can also upload files to Google Drive, including photos, videos, PDFs, and text documents, until they hit the storage limit. Users can set up their personal computer or mobile phone to automatically back up files to their Google Drive Account. Each user gets 15 gigabytes of space for free on servers controlled by Google and may purchase more through a subscription plan called Google One. In addition, Google Drive allows users to share their stored files and documents with up to 100 people and grant those with access the ability to edit or comment. Google maintains a record of who made changes when to documents edited in Google productivity applications. Documents shared with a user are saved in their Google Drive in a folder called

---

[4]   https://support.google.com/calendar

15

"Shared with me."  Google preserves files stored in Google Drive indefinitely, unless the user takes affirmative steps to delete them.[5]

32.      Google provides several messaging services including Duo, Messages, Hangouts, Meet, and Chat.  These services enable real-time text, voice, and/or video communications through browsers and mobile applications, and also allow users to send and receive text messages, videos, photos, locations, links, and contacts. Google may retain a user's messages if the user hasn't disabled that feature, or taken affirmative steps to delete the messages, though other factors may also impact retention. Google does not retain Duo voice calls, though it may retain video or voicemail messages.[6]

33.      Google integrates its various services to make it easier for Google Accounts to access the full Google suite of services.  For example, users accessing their Google Account through their browser can toggle between Google Services via a toolbar displayed on the top of most Google service pages, including Gmail and Drive.  Google Hangout, Meet, and Chat conversations pop up within the same browser window as Gmail. Attachments in Gmail are displayed with a button that allows the user to save the attachment directly to Google Drive.  If someone shares a document with a Google Account user in Google Docs, the contact information

---

[5]  https://support.google.com/drive

[6]  https://support.google.com/messages

https://support.google.com/duo

https://support.google.com/chat

https://support.google.com/hangouts

https://support.google.com/meet

16

for that individual will be saved in the user's Google Contacts. Google Voice voicemail transcripts and missed call notifications can be sent to a user's Gmail account. And if a user logs into their Google Account on the Chrome browser, their subsequent Chrome browser and Google Search activity is associated with that Google Account, depending on user settings.

34.    When individuals register with Google for a Google Account, Google asks users to provide certain personal identifying information, including the user's full name, telephone number, birthday, and gender. If a user is paying for services, the user must also provide a physical address and means and source of payment.

35.    Google typically retains and can provide certain transactional information about the creation and use of each account on its system. Google captures the date on which the account was created, the length of service, log-in times and durations, the types of services utilized by the Google Account, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via Google's website or using a mobile application), details about the devices used to access the account, and other log files that reflect usage of the account. In addition, Google keeps records of the Internet Protocol ("IP") addresses used to register the account and accept Google's terms of service, as well as the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the Google Account.

36.    Google maintains the communications, files, and associated records for each service used by a Google Account on servers under its control. Even after a user takes affirmative steps to delete a communication or file from their Google Account, it often remains available on Google's servers, and thus subject to recovery and preservation by Google, for some time.

37.     In my training and experience, evidence of who was using a Google account and from where, and evidence related to criminal activity of the kind described above, may be found in the Google account services, files, and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion. For example, in this particular investigation, such indicia of account ownership would assist the United States in proving who was, or was not, responsible for the use of the account in the course of soliciting investments in, and/or loans to, MOHLER's various business entities.

38.     Based on my training and experience, messages, emails and documents are often created and used in furtherance of criminal activity—particularly in furtherance of financial fraud schemes, like the one described herein—including to communicate and facilitate the offenses. Thus, stored communications and files connected to a Google Account may provide direct evidence of the offenses under investigation. As applicable in this case, I have probable cause to believe that the **Target Google Account** was used to send and receive email communications, including attached documents, relating to MOHLER's solicitation of investments in, and/or loans to, R8 Coatings, R8 Ghana and/or R&D International from the Victims and others. Further, due to the pervasive integration of Google's various services, as described above, and because there is reliable evidence that MOHLER utilized the **Target Google Account** for internal business communications with employees of R8 Coatings, I also have probable cause to believe that the **Target Google Account** was used to send and receive other non-email forms of messages and communications relating to the business of R8 Coatings, R8 Ghana and/or R&D International. Finally, I have probable cause to believe A) that some or all of the above-described

18

communications still exist within the **Target Google Account**, or B) that other communications still exist within the **Target Google Account** which will corroborate the statements of Victims and others regarding the **Target Google Account's** use in the operation of MOHLER's various business entities described above, either of which would be relevant evidence tending to corroborate that MOHLER acted as the Victims allege.

39.     In addition, the **Target Google Account** user's account activity, logs, stored electronic communications, calendar entries, and other data retained by Google can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, and documents may be evidence of who used or controlled the account at a relevant time, even if otherwise not directly related to the offenses described herein. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation. In the instant case, such "user attribution" or "indicia of ownership" evidence would be relevant to determining whether MOHLER in fact controlled, and was responsible for, the use of the **Target Google Account** in soliciting investments/loans from the Victims on behalf of his various business entities, as the Victims allege.

40.     Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (*e.g.*, information indicating a plan

to commit a crime), or consciousness of guilt (*e.g.,* deleting account information after becoming aware of a criminal investigation, in an effort to conceal evidence from law enforcement).

41.     Other information connected to the use of a Google account may lead to the discovery of additional evidence. For example, emails, instant messages, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

42.     Therefore, Google's servers are likely to contain stored electronic communications and information concerning subscribers, including the user of the **Target Google Account,** and their use of Google's services. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## CONCLUSION

43.     Based on the forgoing, I request that the Court issue the proposed search warrant.

44.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving the warrant on Google. Because the warrant will be served on Google, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## REQUEST FOR SEALING

45.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the

targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

Respectfully submitted,

(Appearing by telephone conference call at 415-527-5035)
Cody Graham
Special Agent
Federal Bureau of Investigation

Attested to by the affiant in accordance with the requirements of Fed. R. Crim. P. 4.1, by appearing via telephone conference call at 415-527-5035 on this 21st day of February , 2024.

HON. BARRY A. BRYANT
UNITED STATES MAGISTRATE JUDGE

21

## **ATTACHMENT A**

### **Property to Be Searched**

This warrant applies to information, including contents of communications, associated with the Google Account '**dougjmohler@gmail.com**' which is stored at premises owned and/or controlled by Google, LLC, and/or its parent company Alphabet, Inc., which are headquartered at 1600 Amphitheatre Parkway, Mountain View, California, in the Northern District of California.

## ATTACHMENT B

### Particular Things to be Seized

**I.   Information to be disclosed by Google, LLC, and/or its parent company Alphabet, Inc.**

To the extent that the information described in Attachment A is within the possession, custody, or control of Google, LLC, and/or its parent company Alphabet, Inc., (hereinafter collectively "Google"), regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to Google, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Google is required to disclose to the government for each account or identifier listed in Attachment A the following information, unless otherwise indicated:

a.   All business records and subscriber information, in any form kept, pertaining to the Account, including:

1.   Names (including subscriber names, user names, and screen names);

2.   Addresses (including mailing addresses, residential addresses, business addresses, and email addresses, including alternate and recovery email addresses);

3.   Telephone numbers, including SMS recovery and alternate sign-in numbers;

4.   **For the period between January 1, 2018, and the date of the issuance of this Search Warrant**: Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions, including log-in IP addresses;

5.   **For the period between January 1, 2018, and the date of the issuance of this Search Warrant**: Telephone or instrument numbers or other subscriber numbers or identities, including any temporarily assigned network address, SMS recovery numbers, Google Voice numbers, and alternate sign-in numbers

6.   Length of service (including start date and creation IP) and types of service utilized;

7. **For the period between January 1, 2018, and the date of the issuance of this Search Warrant**: Means and source of payment (including any credit card or bank account number); and

8. Change history.

b. **For the period between January 1, 2018, and the date of the issuance of this Search Warrant**: All device information associated with the Account, including but not limited to, manufacture names, model numbers, serial number, media access control (MAC) addresses, international mobile equipment identifier (IMEI) numbers, FCC ID numbers, Android IDs, and telephone numbers;

c. **For the period between January 1, 2018, and the date of the issuance of this Search Warrant**: Records of user activity for each connection made to or from the Account(s), including, for all Google services: the date, time, length, and method of connection, data transfer volume, user names, source and destination IP address, name of accessed Google service, and all activity logs;

d. **For the period between January 1, 2018, and the date of the issuance of this Search Warrant**: The contents of all emails associated with the account, including: stored or preserved copies of emails sent to and from the account, draft emails, and deleted emails; attachments; the source and destination addresses associated with each email; the size, length, and timestamp of each email; and true and accurate header information including the actual IP addresses of the sender and recipients of the emails; and any forwarding or fetching accounts relating to the accounts;

e. **For the period between January 1, 2018, and the date of the issuance of this Search Warrant**: Any records pertaining to the user's contacts, including: address books; contact lists; social network links; groups, including Google Groups to which the user belongs or communicates with; and user settings; and all associated logs and change history;

f. **For the period between January 1, 2018, and the date of the issuance of this Search Warrant**: Any records pertaining to the user's calendar(s), including: Google Calendar events; Google Tasks; reminders; appointments; invites; and goals; the sender and recipients of any event, invitation, reminder, appointment, or task; user settings; and all associated logs and change history;

g. **For the period between January 1, 2018, and the date of the issuance of this Search Warrant**: The contents of all records associated with the account in Google Drive (including Docs, Sheets, Forms, and Slides) and Google Keep, including: files, folders, media, notes and note titles, lists, and other data uploaded, created, stored, or shared with the account including drafts and deleted records; SMS data and device backups; the creation and change history of each record; accounts with access to or which previously accessed each record; any location, device, other

2

Google service (such as Google Classroom or Google Group), or third party application associated with each record; and all associated logs, including access logs and IP addresses, of each record;

h.  **For the period between January 1, 2018, and the date of the issuance of this Search Warrant**: The contents of all text, audio, and video messages associated with the account, including Chat, Duo, Hangouts, Meet, and Messages (including SMS, MMS, and RCS), in any format and however initially transmitted, including, but not limited to: stored, deleted, and draft messages, including attachments and links; the source and destination addresses associated with each communication, including IP addresses; the size, length, and timestamp of each communication; user settings; and all associated logs, including access logs and change history.

***Google is hereby ordered to disclose the above information to the government within FOURTEEN (14) DAYS of issuance of this warrant.***

## II.  Information to be seized by the government

All information described above in Section I that constitutes evidence, fruits and/or instrumentalities of violations of Title 18, United States Code, Section 1343 (wire fraud) committed on or after January 1, 2018, by or involving Douglas J. Mohler and/or any business entity owned, controlled and/or operated, in whole or in part, by Douglas J. Mohler, to include R8 Coatings, LLC, R8 Ghana, Ltd., and/or R&D International Holdings, LLC, including, but not limited to, information pertaining to the following matters for each Account or identifier listed in Attachment A:

a.  Records of communications relating to, and/or actions solicited or taken by any person with respect to, investments in, or loans or funds provided to, any business entity owned, controlled and/or operated, in whole or in part, by Douglas J. Mohler, wherever registered or operating;

b.  Evidence indicating how and when the Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner;

c.  Evidence indicating the Account owner's state of mind as it relates to the crime under investigation;

3

    d.    The identity of the person(s) who created or used the Account, including records that help reveal the whereabouts of such person(s).

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.